# In the United States Court of Federal Claims

Nos. 23-1805 and 23-1806
(Filed Under Seal: February 13, 2024)
(Reissued: February 28, 2024[*])

```
* * * * * * * * * * * * * * * * *  *
                                   *
                                   *
THE DISTRICT COMMUNICATIONS        *
GROUP, LLC and CRUXDCG, LLC        *
                                   *
                                   *
         Plaintiffs,               *
                                   *
   v.                              *
                                   *
THE UNITED STATES,                 *
                                   *
         Defendant,                *
                                   *
   and                             *
                                   *
CLEAR VANTAGE POINT                *
SOLUTIONS II LLC,                  *
                                   *
         Defendant-Intervenor.     *
                                   *
* * * * * * * * * * * * * * * * *  *
```

    *H. Todd Whay*, with whom was *Ian A. Cronogue*, Baker, Cronogue, Tolle & Werfel, LLP, of McLean, VA, for Plaintiffs.

    *Steven Michael Mager*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, D.C., for defendant, *Aleia Barlow*, Staff Attorney, and *Danica Hong*, Staff Attorney, Office of General Counsel, Department of Veterans Affairs, of Washington, D.C., of counsel.

    *John E. Jensen*, with whom were *Toghrul M. Shukurlu*, and *Aleksey R. Dabbs*, Pillsbury Winthrop Shaw Pittman, LLP, of McLean, VA, for Defendant-Intervenor.

---

    [*] Pursuant to the protective order entered in this case, this opinion was filed initially under seal. The parties did not provide any proposed redactions of confidential or proprietary information; however, the Court did make minor typographical and stylistic corrections to this version of the opinion.

**OPINION AND ORDER**

**SOMERS**, Judge.

On October 13, 2023, the District Communications Group ("DCG") and a joint venture that DCG is a co-venturer in, CruxDCG, filed directly related bid protests in this Court challenging their exclusion from competition for a Department of Veterans Affairs ("VA") contract to provide "support services to assist [the] VA in reducing and preventing suicide within the military and veteran populations." ECF No. 1 ("Compl.") ¶ 11. Plaintiffs allege that the VA committed prejudicial error in excluding them from competition based on an actual or potential impaired objectivity organizational conflict of interest ("OCI"). *Id.* ¶¶ 35–39. Plaintiffs, the government, and Defendant-Intervenor, have all moved for judgment on the administrative record, and Plaintiffs have requested injunctive relief. For the reasons that follow, Plaintiffs' motion for judgment on the administrative record is granted, the cross-motions are denied, and Plaintiffs are entitled to injunctive relief.

**BACKGROUND**

**A.     Factual History**

On February 9, 2023, the VA issued a solicitation for a procurement titled the "White House Priority Goal Support to Safeguard Against Veteran Suicide" ("WHPG solicitation"), seeking support services "to assist [the] VA in reducing and preventing suicide within the military and veteran populations . . . ." AR 132. The solicitation sought a contractor to "develop an evidence-based approach to integrated care models that address medical, behavioral, and social health. . . . focus[ing] specifically on Priority Goals outlined in the White House Plan for Reducing Military and Veteran Suicide released on November 2, 2021." AR 133. The end product sought was "a Feasibility Analysis and Implementation Plan for board [sic] implementation of evidence-based suicide risk assessment and safety planning within emergency care settings throughout the United States." AR 738. According to the solicitation, the plan was to include "a careful analysis of the internal and external environment of [the] VHA in order to detect opportunities, threats, trends, important lessons, and weaknesses which can impact the current and future strategies of the organization's mission to reduce Military and Veteran Suicide." AR 132.

On March 16, 2023, CruxDCG LLC, a joint venture between Crux Firm LLC and District Communications Group (DCG), submitted a proposal in response to the WHPG solicitation. Compl. ¶ 18. The VA "began evaluation of the proposals on March 28, 2023"; however, "[o]n April 4, 2023, it was brought to the attention of the Contracting Officer, that there may be concerns with potential OCIs with other awarded contracts or planned contract actions . . . ." AR 739. Accordingly, the contracting officer tasked the contracting officer's representative ("COR") "to compile a list of those contracts and planned contract actions which may present an OCI with this solicitation." AR 740. "On April 14, 2023, the COR provided the Contracting Officer with a list of contracts and planned contract actions . . . ." *Id.* That same day, the contracting officer "reviewed the list of contracts and planned contract actions" and "eliminated any contracts that [would] no longer be active at the conclusion of the resultant contract from the [WHPG] solicitation since the contract [would] no longer be available to execute any of the

recommendation included in the delivered Feasibility Analysis and Implementation Plan." *Id.* After eliminating these contracts from the list, the contracting officer "returned the list of contracts and planned contract actions to the COR and requested their review to determine 1) if the remaining contracts or planned contract actions [had] options that extend[ed] beyond December 2025, [and] 2) for those contracts that have the potential to be active, what [was] the Government's intended use for those contracts in the execution of the recommendations." *Id.* The response from the COR "resulted in the identification of the six existing contracts or future contract actions which presented an OCI with [the WHPG] solicitation []." *Id.*

Thereafter, the VA issued an amendment to the WHPG solicitation that included a list of companies excluded from the procurement due to an "actual and/or potential significant conflict of interest." AR 673. DCG was on this list because of its subcontractor work for J.R. Reingold & Associates ("Reingold") under Task Order 47QRAA21D001F 36C10X23F0021 ("Reingold task order"). AR 751. Prior to formally adopting the amendment, the contracting officer sent a letter to Reingold, AR 748–50, informing it that "Reingold, and any and all subcontractors performing under [the existing Reingold task order], [were] to be excluded from participation under [the WHPG] solicitation [] due to an actual and/or potential significant conflict of interest between [the] requirements." AR 750. A few days later, Reingold responded to the contracting officer to assert that there was no potential for an impaired objectivity OCI. AR 751–55. Reingold argued that the WHPG solicitation and the existing Reingold task order did not overlap, that the projects were "distinct and completely separate," that the "scope and scale" of each were dissimilar, and that the WHPG solicitation itself prevented the eventual WHPG contractor from participating in any follow-on work that resulted from advice provided pursuant to the WHPG contract. *See id.* As Reingold discussed in its response to the contracting officer, the solicitation itself provides that, "[t]he prime and any/all subcontractor(s) on this task order shall, for the contract's entire period of performance, plus three years after completion of the contract be restricted from participating in any procurements and/or requirements which stem and/or arise from any recommendations developed under this contract." AR 196.

In a reply to Reingold's letter, the contracting officer disagreed with Reingold's analysis of the OCI issue and reasserted much of the same reasoning of her initial letter to Reingold. AR 756–60. The contracting officer argued that Reingold "could be put in a position to advise and/or recommend [the] VA employ any of the outreach efforts/methodologies Reingold currently implements on [the] VA's behalf under its existing task order, to include conducting pilots that may be run under [the WHPG solicitation]." AR 759. The only mention of Plaintiffs in the contracting officer's letter to Reingold comes in a parenthetical in the last sentence, which asserts that the OCI could not be mitigated were "Reingold (or any of its current subcontractors under its Task Order) to be selected [to] receive the contract award under this solicitation." AR 760.

On the same day that the contracting officer sent her reply to Reingold, the VA amended the WHPG solicitation to "exclude[] from participation under this solicitation due to an actual and/or potential significant conflict of interest as either the prime or subcontractor" a list of companies, which included both Reingold and DCG. AR 673.

3

B.     **Procedural History**

On June 15, 2023, both DCG and CruxDCG filed protests with the GAO, which were later consolidated. Compl. ¶¶ 27, 28. They protested that the VA acted unreasonably in excluding them from the WHPG procurement. *See generally* AR 1000–1007. Specifically, they argued that "[t]here [was] no potential for conflicting DCG roles that might bias its judgment, nor any unfair competitive advantage based upon its work as a subcontractor for the Reingold [task order]." AR 1005. Moreover, they contended that "[t]o the extent that a potential or actual OCI issue exists, DCG could easily avoid, neutralize, or mitigate it due to the subcontract work only involving two of its employees." *Id.* On September 25, the GAO issued a decision denying both protests. *In re The Dist. Commc'ns Grp., LLC; Cruxdcg LLC*, B-421581.2 (Sept. 25, 2023). Both CruxDCG and DCG filed protests in this Court on October 13, 2023, which the Court consolidated.

## DISCUSSION

A.     **Legal Standard**

The Tucker Act, as amended by the Administrative Dispute Resolution Act, provides the Court with "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). In exercising this jurisdiction, the Court is to "review the agency's decision pursuant to the standards set forth in section 706 of title 5," *id.* § 1491(b)(4), which provides in relevant part that the protested agency action shall be reviewed to determine whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).

The Federal Circuit has defined a two-part test to determine the merits of a bid protest under the APA standard. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). First, the protestor must show that either "the procurement official's decision lacked a rational basis" or "the procurement procedure involved a violation of regulation or procedure." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). Second, "[t]o prevail in a bid protest, a protestor must show a significant, prejudicial error in the procurement process." *Id.* (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)) (internal quotes omitted). To establish that it has suffered a prejudicial error in a pre-award bid protest, a protestor must demonstrate that it has suffered a "non-trivial competitive injury." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361 (Fed. Cir. 2009). In a post-award protest, a protestor must demonstrate that "there was a 'substantial chance' it would have received the contract award but for the [agency's] errors in the bid process," in order to demonstrate prejudice. *Bannum, Inc.*, 404 F.3d at 1358 (citations omitted).

The typical resolution of a bid protest is through a ruling on cross-motions for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). In ruling on a motion for judgment on the administrative record, the

4

Court is "to make factual findings from the record evidence as if it were conducting a trial on the record." *Id.* at 1354. Thus, the Court's inquiry assesses "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006). In other words, "[p]ursuant to RCFC 52.1, in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record." *PAE Applied Techs., LLC v. United States*, 154 Fed. Cl. 490, 504 (2021) (citing cases).

**B.       Analysis**

This bid protest presents one issue: whether the contracting officer committed prejudicial error by excluding Plaintiffs from participation in the WHPG solicitation because of an actual or potential organizational conflict of interest. After careful review of the relevant portions of the administrative record, the Court concludes that the contracting officer's decision to exclude Plaintiffs was irrational and prejudicial to Plaintiffs.

**1.    The Contracting Officer's OCI Determination was Irrational**

As explained above, the contracting officer determined that J.R. Reingold & Associates had "the potential for an impaired objectivity OCI" because of the overlap between its existing task order with the VA and the WHPG solicitation. AR 742. Additionally, the contracting officer concluded that Plaintiff DCG, as a subcontractor on Reingold's existing task order, "face[d] an un-mitigatable conflict of interest under [the WHPG] solicitation." AR 750. Accordingly, DCG and CruxDCG, the joint venture to which DCG is a partner, were excluded from competition. The contracting officer's reasons for excluding Reingold, and thus Plaintiffs, were set forth in two letters written to Reingold (one written on May 12, 2023, and a second written on May 26, 2023) and a memorandum issued on May 26, 2023. *See generally* AR 738–60.

According to the contracting officer, her review of the "scope of work" for Reingold's existing task order revealed "that its stated contract performance requirements, as well as its required deliverables, closely align to the nature of services for which the VA seeks advisory assistance with under [the WHPG solicitation's] stated objectives." AR 750. The contracting officer found that "the Statement of Objective (SOO) section 6.1.1 of [the WHPG solicitation], which discusses Priority Goal 1, gives rise to this conflict concern, based on . . . Reingold['s] contract performance requirements set forth within [its existing] task order." AR 748. Specifically, the contracting officer determined that "Reingold's [existing] task order [], based on its stated scope of work, requires actual performance and/or fulfillment of the same and/or highly similar services for which [the] VA . . . seeks to obtain advisory services and/or contractor-derived recommendations in its efforts to achieve and/or fulfill the While House Priority Goals set forth in this solicitation, notably Priority Goal 1." AR 749. In other words, according to the contracting officer, the "performance requirements and / or deliverables under Reingold's [existing task] order are all examples of the types of tasks and services VA seeks advisory support for in considering its best course of action to meet the White House Priority Goals set forth in [this] solicitation . . . ." *Id.* (emphasis omitted). In short, the contracting officer

determined there was overlap between Reingold's existing task order and the work to be performed under the WHPG solicitation.

The contracting officer further determined that this overlap was problematic because "the period of performance set forth within Reingold's task order indicates it will be performed concurrently with that of this solicited effort for advisory and consulting services, which has a shorter period of performance than Reingold's existing task order." *Id.* Therefore, the contracting officer concluded that "Reingold, were it to perform both its existing task order as well as this solicited effort, could potentially be in a position to advise VA, under this effort, to utilize the recommended support services and/or required contract deliverables it already provides to the Government under [its existing] task order . . . ." *Id.*

On May 26, 2023, the contracting officer followed up on her initial OCI determination with another letter, AR 756–60, and a memorandum, AR 761–65. The memorandum simply memorialized the OCI determination, AR 738–42; the letter was more detailed and replied to Reingold's response to the initial the OCI determination, AR 756–60. In this reply letter, the contracting officer further explained that:

- Reingold[] . . . has not provided a basis to alter [her] initial finding that performance of [the existing] task order [] gives rise to a potential and / or actual significant conflict of interest under [the WHPG] solicitation . . . . AR 756.

- Reingold's assertion that the Task Order and the Solicitation are for different, unconnected scopes of work [was] therefore not accurate; both efforts address the need for VA to ensure the effectiveness of its outreach efforts with regard to suicide prevention. AR 757.

- Reingold is now providing modalities of implementation . . . for which, under [the WHPG] solicitation [], [the] VA is seeking advisory support / recommendations for conducting future potential suicide prevention outreach efforts. It is therefore possible that Reingold, were it [to] receive the contract award . . . , would be in a position to potentially advise and/or recommend that VA use/implement the same outreach methodologies and efforts Reingold currently provides to VA under [its existing] task order . . . . Reingold's performance of this effort could thus be impaired, as it could potentially make recommendations under it which could / has the potential to provide Reingold with a financial benefit under [its existing] task order . . . . AR 758.

- Therefore, Reingold, given its task order is for mental health outreach . . . , could be put in a position to advise and/or make recommendations under this requirement which may cause it to favor and / or potentially benefit it by helping it to meet the performance requirements of [its existing] task order . . . . *Id.* (emphasis omitted).

- It is possible . . . that Reingold, were it to receive the award under [the WHPG] solicitation [], could be put in a position to advise and / or recommend [the] VA to employ any of the outreach efforts / methodologies Reingold currently implements

6

on [the] VA's behalf under its existing task order, to include conducting pilots that may be run under this effort. Thus, Reingold could potentially be in a position where it may benefit itself under its existing task order if it also performs this effort. AR 759.

In sum, the contracting officer determined that an actual or potential OCI may exist because of an "improper crossover" between Reingold's existing task order and the WHPG solicitation, *id.*, and that this "improper crossover" applied to "any and all subcontractors, to include [t]he District Communications Group (DCG)," AR 750. Although the contracting officer's concerns are, in a vacuum, to some extent understandable, they are, in context, irrational.

To begin, the Court must emphasize that it examines only the contracting officer's findings and any documents in the administrative record upon which the contracting officer relied in making those findings to determine whether the contracting officer's OCI conclusion regarding Plaintiffs was rational. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). Both the GAO, in its decision in Plaintiffs' previously filed GAO protest,[1] and the government,[2] in its merits briefing in this matter, supplied reasoning in support of the contracting officer's decision that is nowhere to be found in the contracting officer's OCI determination or elsewhere in the administrative record.

---

[1] For instance, in its decision, GAO asserts that:

> Second, the protesters' position fails to recognize that an impaired objectivity OCI can arise not only in situations where a firm is in a position to recommend its own products or services, but also *in circumstances where it can recommend—or not recommend—the products and services of its competitors*. . . . The central concern in such circumstances is that the objectivity of a firm's advice could also be impaired because of the potential to adversely impact the interests of competitors.

*In re The Dist. Commc'ns Grp., LLC; CruxDCG LLC*, B-421581.2 (Sept. 25, 2023) (emphasis added). Although this "interests of competitors" rationale may be true, this reasoning is not contained in the contracting officer's decision, which focuses exclusively on how Reingold (and to a lesser extent any of its subcontractors) will be in a position to recommend *its* services and deliverables to the VA under its existing contract. The contracting officer raises no concerns regarding Reingold avoiding recommending another company's services.

[2] In addition to also asserting the same above argument that the GAO asserts regarding "not recommending" competitors, the government also makes an argument related to Reingold potentially recommending that the VA exercise option years on the existing task order. Gov't MJAR at 15 ("As a subcontractor on the Reingold [task order], DCG plainly has an incentive to recommend—as part of its advice to the VA under the White House Priority Goal Contract—that the VA continue to exercise its option years under the Reingold [task order]."). The contracting officer's determination says nothing about DCG or Reingold having an incentive to recommend that the option years be exercised. Rather, the contracting officer's determination seems to operate from the presumption that the option years will be exercised and that the perceived danger is that DCG or Reingold will "recommend the strategies and/or the services *it already provides* under [the] task order . . . [especially because the WHPG solicitation] may benefit the *current* objectives, scope, and contract performance requirements of [the existing] task order [] *already being provided* to the Government by Reingold." AR 750 (emphasis added).

The Court will not give these post-hoc rationalizations any weight. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971) ("'[P]ost hoc rationalizations . . . have traditionally been found to be an inadequate basis for review."). Rather, the Court will rely on the grounds the contracting officer invoked when she made her OCI determination to determine the rationality of that decision.

As outlined above, there are essentially two aspects to the contracting officer's determination that an actual or potential OCI exists. First, the contracting officer found an overlap between Reingold's existing task order and the advisory services to be provided under the contract that will result from the WHPG solicitation. Plaintiffs do not challenge this finding. Moreover, "[f]or purposes of an impaired objectivity OCI analysis, . . . it is wholly irrelevant whether the two efforts are same or similar in scope or size; instead, what is relevant is whether the contractor would be in a position of reviewing its own work or otherwise unable to perform its obligations in an impartial manner." *In re Guidehouse LLP*, B-419848.3 (June 6, 2022) (finding that "the contracting officer improperly substituted similarity (or lack thereof) between the two efforts for a reasonable determination of whether Deloitte's work on the CFO support services task order could be objectively performed in light of its work on the [relevant] task order"). Second, the contracting officer found that this meaningful overlap could lead to an actual or potential OCI if the VA awarded Reingold or any of its subcontractors the WHPG contract. This second finding is the focus of Plaintiffs' protest.

In general, an impaired objectivity OCI may occur in instances in which a contractor is tasked with "evaluat[ing] its own offers for products or services, or those of a competitor." 48 C.F.R. § 9.505-3. Stated differently, an "'impaired objectivity' [OCI] occurs when a government contractor has conflicting obligations under different government contracts[] that compromises the contractor's ability to render impartial judgment." *Axiom Res. Mgmt., Inc. v. United States*, 78 Fed. Cl. 576, 592 n.17 (2007). The "primary concern" with such an OCI is that "a firm might not be able to render impartial advice" to the government. *Turner Const. Co., Inc., v. United States*, 94 Fed. Cl. 561, 569 (2010) (internal quotations omitted).

As stated above, Plaintiffs do not challenge the overlap between the task order and the solicitation; rather, their focus is on whether their ability to provide impartial advice has been compromised or has the potential to be compromised. The Court concurs with Plaintiffs that the contracting officer's determination of an actual or potential OCI is irrational.

First, under the contracting officer's rationale, it would appear obvious that Plaintiffs' impartiality could not be called into question for work that the VA is already required to purchase from Reingold under its existing task order. The contract line items ("CLINs") in the existing Reingold task order include both guaranteed minimum CLINs—"required tasks"—and optional CLINS that the VA may exercise, which Reingold must then deliver. *See generally* AR 1720–44. The "required tasks" would not seem capable of raising OCI concerns because Reingold is, in essence, guaranteed this work regardless of anything that it could recommend to the VA if it were awarded the WHPG contract. *See, e.g.*, AR 1729 (distinguishing between "Option Period 1 Required Tasks Subtotal" and "Option Period 1 Optional Tasks Subtotal"). That is to say, the rationale behind the contracting officer's decision is that a conflict has the potential to occur because Reingold could recommend, as part of the plan produced at the end of

the WHPG contract, that the VA purchase services Reingold is contracted to provide under its existing task order.  But for this rationale to make sense, the contracting officer must be referring to services that Reingold is obligated to provide only if the VA exercises its option for those services.  There would be no obvious benefit for Reingold to recommend services that are already required to be purchased under the existing task order; the VA is obligated to purchase the "required tasks" regardless of recommendations made pursuant to the WHPG contract.  The contracting officer did not provide a rationale as to how the WHPG contract could affect the "required tasks" under the existing task order, nor is such a rationale obvious to the Court; therefore, these "required tasks" could not support an actual or potential impaired objectivity OCI finding.  Moreover, to the extent that "required tasks" *could* present an impaired objectivity concern, the contracting officer's OCI determination simply does not provide an explanation as to how this could be the case.  The Court assumes any such explanation is lacking because the contracting officer was solely concerned with the "optional tasks" under the existing task order in her OCI determination.

Thus, it is clear that the "optional tasks" are the center of the contracting officer's OCI determination.  Out of context, the "optional tasks" might present at least the potential for an impaired objectivity OCI.  However, Plaintiffs assert the solicitation contains an OCI mitigation clause that covers even the possibility that their objectivity could be compromised based on Reingold's existing task order.  Namely, the WHPG solicitation provides:

> Please be advised that any Contractor, including its team members, that receives the award may be subject to an OCI.  The prime and any/all subcontractor(s) on this contract shall, for the contract's entire period of performance, plus three years after completion of the contract be restricted from participating in any procurements and/or requirements which stem and/or arise from any recommendations developed under this contract.

AR 966.  According to Plaintiffs, this clause addresses the impaired objectivity concerns raised by the contracting officer in her OCI determination and, therefore, makes her OCI determination irrational.

In response to Plaintiffs' argument, the government counters that "[b]y its express terms, this exclusion does not address *existing* contracts—like the Reingold TO—for which the VA will not have to issue a new procurement. . . .  The Reingold TO cannot be 'issued based upon the Plan' because it already exists."  ECF No. 28 ("Gov't MJAR") at 16 (emphasis in original).  In other words, according to the government, "the OCI restriction is necessarily limited to *contracts* that could 'stem' or 'arise' from a recommendation in the Plan" and, because the Reingold task order already exists, it cannot stem or arise from the plan that is at the center of the WHPG solicitation.  ECF No. 31 ("Gov't Reply") at 3 (emphasis added).  Therefore, the government argues, the OCI mitigation clause is inapplicable and does nothing to mitigate the actual or potential OCI found by the contracting officer.  But the government's argument only finds support by inserting the word "contracts" in place of the phrase actually used in the solicitation: "procurements and/or requirements."  As will be explained, the term "contract" is not directly interchangeable with the phrase "procurements and/or requirements."  The government then attempts to focus the Court on the terms "stem" and "arise from" to make its argument that an

9

existing *contract* cannot "stem" or "arise from" the WHPG solicitation. *Id.* ("[P]laintiffs make no effort to explain how the Reingold TO—an existing contract—could somehow 'stem,' 'arise,' or, as plaintiffs put it, 'derive' from a forthcoming Plan."). Although the government would state a rather obvious proposition if the OCI mitigation clause only covered existing *contracts*, that proposition does not hold up when the actual (and relevant) term from the solicitation's OCI mitigation clause—"requirements"—is substituted for "contract." In other words, as explained below, the term "requirements" is the key to why the OCI mitigation clause does, in fact, cover the actual or potential OCI identified by the contracting officer.

Similar to the government's mistaken interpretation of the OCI mitigation clause, the contracting officer also misinterpreted the plain meaning of the clause in her OCI determination:

> The solicitation's cautionary conflict of interest language puts all potential Offerors on notice of the potential for exclusion from future requirements that may stem from performance of this effort. That does not, however, preclude an Offeror with an existing contract or Order from having a conflict of interest under this solicitation. The solicitation's restriction on future efforts/requirements is not the same analysis and/or concern for determining whether a potential Offeror has a potential and/or actual significant conflict of interest under this solicitation due to other work the Offeror performed/may be performing. In other words, the exclusion from participation in future solicitations which may result from recommendations delivered under this requirement does not address, or absolve in any way, the perceived impaired objectivity conflict presented by Reingold's [existing] task order [] when viewed in light of the requirement for a Feasibility Analysis and Implementation Plan to be developed under a contract awarded as a result of [the WHPG] solicitation . . . .

AR 759 (emphasis in original). Like the government's MJAR argument, the contracting officer also ignored any significance in the OCI clause's use of the phrase "procurements or requirements." In fact, she intermixes several terms in place of the phrase: "future requirements"; "future efforts/requirements"; "other work the Offeror performed/may be performing"; and "future solicitations."

Not to be left out, Defendant-Intervenor similarly misinterprets the meaning of the OCI mitigation clause. After providing the Black's Law Dictionary definitions of "stem" and "arise," Defendant-Intervenor posits that "the Solicitation does not affect *contracts* that have already been awarded, like the Reingold TO, as they cannot 'originate' from the Plan that will be provided to the Government in 2025." ECF No. 29 at 10 (emphasis added). The problem with Defendant-Intervenor's argument, like that of the government, is that the OCI mitigation clause is not limited to "contracts."

Rather, the OCI mitigation clause applies to any "procurements or requirements." The key term being "requirements." Recall that the contracting officer is concerned that Reingold would "be in a position to recommend the strategies and/or services it already provides under [its existing] task order." AR 750. And recall, the Court has already determined that strategies and/or services Reingold is "required" to provide under its existing task order—"required

tasks"—cannot present an actual or potential OCI under the rationale provided by the contracting officer in her OCI determination. That leaves strategies and/or services that Reingold is contracted to provide under the existing task order, but only as required by the VA—"optional tasks"—as the only strategies and/or services that could actually or potentially lead to an OCI. However, these optional strategies and/or services are covered by the term "requirements" and are, therefore, covered by the OCI mitigation clause. Because these strategies and/or services are covered by the OCI mitigation clause, they cannot support a finding of an actual or potential OCI (at least not under the rationale provided by the contracting officer).

Under the FAR, a "task order" is "a contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract." 48 C.F.R. § 16.501-1. Moreover, "[p]ursuant to 10 U.S.C. 3401 and 41 U.S.C. 4101, requirements contracts and indefinite-quantity contracts are also known as delivery-order contracts or task-order contracts." 48 C.F.R. § 16.501-2. A requirements contract, in turn, "provides for filling all actual purchase *requirements* of designated Government activities for supplies or services during a specified contract period, with deliveries or performance to be scheduled by placing orders with the contractor." 48 C.F.R. § 16.503(a) (emphasis added). And, as explained by this Court's predecessor, an indefinite quantity contract "differs from a requirements contract in that under a requirements contract the buyer agrees to purchase all his *requirements* from the seller. Under an indefinite quantities contract, even if the buyer has *requirements*, he is not obligated to purchase from the seller." *Mason v. United States*, 222 Ct. Cl. 436, 443 n.5 (1980) (emphasis added). The point here is not whether the existing Reingold task order is a requirements contract or an indefinite quantity contract; the point is that, under either type of contract, the supplies or services the government has the option to purchase are "requirements" once the government has a need for them. The definition of "requirement" confirms this: "[s]omething that someone needs or asks for." *Requirement*, BLACK'S LAW DICTIONARY (11th ed. 2019); *accord Requirement*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) ("[S]omething that is wanted or needed."). Here, the VA will only purchase the "optional tasks" under Reingold's existing task order if it needs them. The "optional tasks," which, as explained above, must be the focus of the contracting officer's OCI determination, become "requirements" once the VA determines it needs them.

The contracting officer based her OCI determination on the concern that if Reingold was awarded the WHPG contract, it could potentially recommend or advise the VA to purchase optional services from the existing Reingold task order. However, if the VA decided to purchase any of those services based on a recommendation from the plan submitted as part of the WHPG contract, they would constitute "requirements which stem and / or arise from any recommendations developed under this contract"; thus, Reingold would be "restricted from participating" in supplying those services. Therefore, by the contracting officer's own reasoning, there could not be an actual or potential OCI because Reingold would have no obvious incentive to recommend its own services because it would be prohibited from providing them even if recommended. Accordingly, the contracting officer's OCI determination is irrational.

Furthermore, the contracting officer's OCI determination suffers from additional flaws because of the contracting officer's inadequate explanation of some of her conclusions. That is

11

to say, the Court cannot determine the reasonableness of certain conclusions in the OCI determination or whether the contracting officer considered all aspects of the problem when all the Court has to assess is the conclusion itself.  *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation").  For instance, there is no real explanation as to why a subcontractor of Reingold, like DCG, has an actual or potential OCI that requires its exclusion from competition under the WHPG solicitation.  The contracting officer simply repeats that, with regard to Reingold and its subcontractors, "there is the potential . . . that *the vendor* performing this existing task order will be in a position to recommend the strategies and/or services it already provides under [the existing] task order [] when advising [the] VA on potential methods to meet the goals and objectives [under the WHPG contract]."  AR 750 (emphasis added).  First, it is unclear which entity is "*the* vendor" as the sentence mentions at least eight entities.  Second, while there is no dispute that there is overlap between Reingold's existing task order and the WHPG solicitation, there is no explanation of how that overlap affects subcontractors.  In fact, the sentence related to subcontractors even states that subcontractors that have "*performed*" work under the [existing] task order" have an "un-mitigable" OCI.  It is not obvious how *past* work under the solicitation could lead to an OCI related to the provision of *future* work.  There may be a reasonable explanation, but the contracting officer simply does not provide one.

In addition, the contracting officer simply states, without explanation, that mitigation of the actual or potential OCI is not possible.  Although it is well-settled that "an agency shall not award a contract to an offeror with an impaired objectivity OCI 'without proper safeguards to ensure objectivity to protect the Government's interests,'" *Paradyme Mgmt., Inc. v. United States*, 167 Fed. Cl. 180, 186 (2023) (quoting 48 C.F.R. § 9.505-3), the contracting officer offers no explanation as to why the actual or potential OCI she identified cannot be mitigated.  This lack of an explanation is especially problematic regarding subcontractors given the limited explanation of why Reingold's subcontractors also have an OCI.  Once again, the Court simply cannot evaluate why the OCI was not mitigable.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *see also Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) ("[I]t is well settled that an agency must explain its action with sufficient clarity to permit 'effective judicial review.'" (citing *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)).

In sum, given the OCI mitigation clause contained in the WHPG solicitation and her inadequate explanation in support of some of her findings, the Court must conclude that the contracting officer's OCI determination with regard to Reingold (and thus Plaintiffs) was irrational.

## 2. The Contracting Officer's Unreasonable OCI Determination Prejudiced Plaintiffs

In addition to contesting Plaintiffs' argument that the contracting officer's OCI determination was in error, the government asserts that Plaintiffs have failed to meet their burden to demonstrate that they were prejudiced by the alleged errors. To this end, the government argues that Plaintiffs did not satisfy the correct burden for demonstrating prejudice because Plaintiffs only assert that they have satisfied the prejudice standard for pre-award bid protests. According to the government, "[a]lthough plaintiffs contend that CruxDCG 'would have a greater-than-insignificant chance of winning the White House Priority Goal Contract,' they do not assert that there was a 'substantial chance' CruxDCG would have received the contract but for the CO's OCI determination." Gov't MJAR at 18 (internal citations omitted). Thus, the government concludes that "plaintiffs have not satisfied their burden of demonstrated prejudice under this higher standard" that applies in post-award bid protests. *Id.*

In response, Plaintiffs reassert that the correct prejudice standard in this bid protest is the pre-award standard and that, even if the post-award substantial chance standard is applied, they nonetheless satisfy it. According to Plaintiffs, they had a substantial chance of award, because "[i]f DCG were permitted to participate in this procurement, the CruxDCG JV would have submitted a proposal that was not only significantly less expensive than [Defendant-Intervenor's] offer, but was technically equal to or superior to [Defendant-Intervenor's] offer based upon the extensive expertise, experience, and proposal writing skills of the JV's mentor, DCG." ECF No. 30 at 9–10. In its reply brief, the government rejoins that Plaintiffs waived any argument related to substantial chance by not raising it in their opening brief. *See* Gov't Reply 5–7. The government, however, does not respond to the merits of either Plaintiffs' non-trivial competitive injury prejudice argument or their substantial chance argument. Instead, the government rests on its legal argument that Plaintiffs applied the wrong standard in their opening brief and waived any argument regarding substantial chance because they did not raise it in their opening brief. *See generally id.*

While the debate between Plaintiffs and the government regarding the proper showing for prejudice in this bid protest is intriguing, the Court need not weigh in on it at this time, because the Court does not concur with the government that Plaintiffs waived their substantial chance argument. Although the government correctly cites the waiver rule, no waiver has occurred here. Plaintiffs argued in their opening brief that the contracting officer's erroneous OCI determination prejudiced them by causing them a non-trivial competitive injury. In short, they made a prejudice argument. The government responded to this argument by asserting that Plaintiffs applied the wrong legal standard, but the government did not address the merits of Plaintiffs' allegedly incorrect prejudice argument. Plaintiffs then, in response to the government's argument regarding the legal standard for prejudice, argued that, even though the government was incorrect as to the proper standard, Plaintiffs nevertheless satisfied the government's preferred standard. This is not waiver *by Plaintiffs*. The government would have been on firmer footing regarding waiver if Plaintiffs had not addressed prejudice in their opening brief or if Plaintiffs had abandoned their non-trivial competitive injury argument in their response brief. But Plaintiffs did neither. Rather, it is the government that left Plaintiffs' factual assertions regarding prejudice unaddressed. Accordingly, with nothing from the government to rebut

13

Plaintiffs' assertions regarding why it was prejudiced (either because it suffered a non-trivial competitive injury or had a substantial chance for award), and with Plaintiffs having made a reasonable factual argument regarding both prejudice standards, the Court finds that Plaintiffs were prejudiced by the contracting officer's irrational OCI determination.

### 3. Plaintiffs are entitled to Injunctive Relief

In order to determine if a permanent injunction is warranted, the Federal Circuit has articulated a four-part test that requires the Court to consider whether:

> (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief.

*Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004)). Because, as discussed above, Plaintiffs have succeeded on the merits of this protest, the Court would ordinarily turn to an analysis of the three remaining injunctive relief factors. *See Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 & n.13 (Fed. Cir. 2018) ("[P]roving success on the merits is a necessary element for a permanent injunction, [but the court] may balance the remaining three *Centech* permanent injunction factors—irreparable harm, balance of hardships, and public interest—when deciding whether to grant or deny injunctive relief . . . .").

However, in this protest, both the government and Defendant-Intervenor offered no argument whatsoever regarding the remaining injunctive relief factors, thereby conceding that those factors weigh in favor of Plaintiff. *Sarro & Assocs., Inc. v. United States*, 152 Fed. Cl. 44, 58 (2021) ("A party's failure to raise an argument in an opening or responsive brief constitutes waiver."); *see also Cap Exp., LLC v. Zinus, Inc.*, 722 F. App'x 1004, 1009 (Fed. Cir. 2018) (quoting *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F.Supp.2d 1125, 1132 (C.D. Cal. 2011), for the proposition that "in most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue."). Accordingly, given Plaintiffs' adequate demonstration on the remaining factors and the defendants' waiver of any argument on these factors, the Court determines that the remaining factors weigh in Plaintiffs' favor and that Plaintiffs, therefore, are entitled to injunctive relief.

## CONCLUSION

For the reasons set forth above, the Court orders the following:

1. The cross-motions for judgment on the administrative record filed by the government and Defendant-Intervenor are **DENIED**.

2. Plaintiffs' motion for judgment on the administrative record is **GRANTED**, and their request for injunctive relief is **GRANTED**.

3. The United States, including the United States Department of Veterans Affairs, its officers, agents, and employees, is hereby **PERMANENTLY RESTRAINED AND ENJOINED** from continuing to obtain performance on the contract awarded pursuant to the White House Priority Goals solicitation (Solicitation 36C10X23R0006) unless and until it determines—in a manner that is not inconsistent with this opinion or the limits on agency action after its initial grounds for taking agency action have been found inadequate, *see Regents of the Univ. of Cal.*, 140 S.Ct. at 1908—that J.R. Reingold & Associates and "any and all subcontractors, to include [t]he District Communications Group (DCG)," on Reingold's existing task order do, in fact, have an unmitigable organizational conflict of interest that prevents them from competing for the award of the White House Priority Goals solicitation.

4. The parties shall confer to determine agreed-to proposed redactions to this opinion. On or before **February 23, 2024**, the parties **SHALL** file a joint status report indicating their agreement on proposed redactions, attaching a copy of those pages of the Court's opinion that contain proposed redactions, with all proposed redactions clearly indicated.

5. The Clerk shall **ENTER** final judgement accordingly.

**IT IS SO ORDERED**.

                                                s/ Zachary N. Somers  
                                                ZACHARY N. SOMERS  
                                                Judge